WILL OF KNOEPFLE: SOWA and others, Appellants, vs. MEYER, Guardian *ad litem,* and another, Respondents.

*September 16—October 12, 1943.*

*John A. Dorney* and *Woodrow J. Bach,* both of Milwaukee, for the appellants.

*Eugene P. Meyer* of Milwaukee, guardian *ad litem,* for respondent unknown minor or incompetent heirs.

For the respondent state of Wisconsin there were briefs by the *Attorney General, James Ward Rector,* deputy attorney general, and *Beatrice Lampert,* assistant attorney general, and oral argument by *Mrs. Lampert.*

FOWLER, J. Fred Sowa and Thadaeus Kuligowski, the executors named in an instrument purporting to be the will of Ernst Knoepfle, deceased, proffered the instrument for probate as his will. The petition named as heirs the persons named in the instrument as beneficiaries. A petition for administration that had been filed by a creditor recited that the decedent left no heirs. In the probate proceedings the court appointed a guardian *ad litem* for unknown minor and incompetent heirs. The person so appointed objected to the probate of the instrument as a will on the grounds that the decedent did not sign it; that it was not duly executed; that the decedent was incompetent at the time it purported to be executed; and that it was procured by undue influence exerted on the decedent by the executors, who were the principal beneficiaries of the will. Mr. Meyer as guardian *ad litem* produced witnesses and vigorously opposed the admission of the instrument to probate. The court found that the instrument was signed and duly witnessed as a will; but that the deceased was incompetent at the time of the signing, and that the instrument was procured by undue influence exercised by the executors and principal legatees, and denied its admission to probate.

The will was executed September 23, 1940. A will in precisely the same terms as to disposal of the property was executed the same day by testator's wife. The property was all held in joint tenancy. The legatees named in the will were all close relatives of the wife. The wife was a prime factor in the accumulation of the joint property, which was worth about $35,000. A witness, in whom the trial judge stated in a written decision filed he placed great confidence testified that the wife was "the boss." She took the main part in managing the property, except the saloon operated by the testator for which he bought and paid for the supplies and of which he was the bartender, and in operating the saloon she participated actively, assisting in tending bar and attending to keeping the

place clean and neat. There is no suggestion that at the time the will was made she was not fully competent, did not know what the joint property consisted of, or did not know who her relatives were. The testator and his wife had been married thirty-five years. She had been a good wife to him. As the testator had no relatives of his own and knew the beneficiaries named in the will, it was not unnatural that he should be satisfied to leave the property, if he survived his wife, as she wished it to go if she survived him. There is no evidence or any circumstance to indicate or arouse suspicion that at or before the time the two wills were made any of the legatees exercised or attempted to exercise any influence upon the testator or his wife. Presumably whatever influence, if any, was exercised upon the testator in making his will was exercised by his wife in requesting that as he had no relatives she would like the property to go to her relatives, and there would be nothing wrong in that.

We perceive no useful purpose in detailing the evidence bearing upon the competency of the testator when he made his will. Suffice it to say that we have considered carefully all the evidence, and are constrained to hold that the findings of incompetency and undue influence are contrary to the great weight and clear preponderance of the evidence, and we must therefore reverse the judgment and direct admission of the instrument in suit to probate. We will only say that testimony of two physicians who attended the testator's wife during her last illness, and were in attendance upon her when the will was made and for a month or two prior thereto—the wife died a month and nineteen days after the will was executed—gave it as their opinion, based upon their observations of the testator and conversations with him during the period stated, that at the date of the signing of the will he was mentally competent. Several disinterested lay witnesses who saw the testator as often as once or twice a week and related their conversations with him in which they testified he appeared natural and

rational gave it as their opinion that he was mentally competent. Other lay witnesses gave testimony of conversations with him and incidents occurring during them, and expressed the opinion that he was incompetent, but much of the matters they testified to occurred after the wife's death, some of them shortly before the testator's death, which occurred fourteen months after the will was drawn. Much stress was laid by nearly all of these witnesses on the fact that the testator refused to attend his wife's funeral and seemed to them to be indifferent to his wife's death and immediately after the funeral played on an electric piano and some other instruments in his saloon. This was peculiar conduct, but it did not prove mental incompetency at the time of the wife's death, much less at the time of the making of the will. The undertaker who conducted the funeral gave a reasonable explanation of this incident. He said relative to it:

"Mr. Knoepfle made the funeral arrangements in his place of business. . . . I went to see Mr. Knoepfle in regard to funeral arrangements. I took a book for him to select a casket from. He looked over the catalog of caskets and says 'I allow you $200 for this funeral.' . . .

"*Q*. Did you discuss with him the matter of his viewing the remains of his wife? *A*. Yes.

"*Q*. And what did he tell you about that? *A*. I had asked him as to when he wanted to come over, and if he wouldn't be able to walk very well or so, I would gladly come over with the machine and get him to bring him over. Of course, Mr. Knoepfle told me, he says, he had seen his wife in life and he don't care to see her after her death. I did question him about that, as if he didn't think that the outside would talk in regards to it, and it would look much better if the husband would come to the funeral, so he said, 'I don't care what the outside says about it, I do as I like and I am not going.' . . . He expressed himself that he couldn't stand to come to the funeral and have others standing around to look at him."

The witness further testified:

"The funeral amounted to $208. Mr. Knoepfle paid me the very same day. He had told me, 'When everything is

over, be sure you come over.' He wanted to pay for the funeral. As far as I know he seemed clear and rational and was very sharp as to what to spend for his wife's funeral. He made answers to my questions. None of the answers were out of the way. If I recall I visited him about three times after the death of his wife. My visits did not last long. I would drop in, buy some cigars and he would tell me he had been to the bank, and so forth. Once I was there he was not home, he explained he had gone to the bank. He discussed his days as a soldier and was very rational in those conversations. He was very proud of being a soldier. As far as I could see, I couldn't see anything wrong."

Two other physicians produced by Mr. Meyer testified as experts in answer to a written hypothetical question occupying fourteen printed pages of the appellants' appendix. At the close of the reading of the question which the witness, Dr. Powers, had previously read, this question was put to him:

"*Q.* Can you state with reasonable certainty whether such person [testator] had sufficient mental competency to make a valid will on September 23, 1940? *A.* Yes, sir.

"*Q.* What is your opinion? *A.* In my opinion he had not."

Counsel for proponents then put a hypothetical question including facts omitted from Mr. Meyer's question. The latter then objected on the ground the question should be enlarged. To which the court replied, "Oh, I don't know. I could strike out a lot of yours," and said "I will let him [counsel for proponents] go ahead." In answer to the hypothetical question of proponents' counsel the answer was: "Well, then . . . I see no basis for any other statement than that he [testator] was a normal individual."

To the same hypothetical question submitted to Dr. Garvey he gave as his opinion that the testator did not possess sufficient mental capacity to make a will.

On the assumption that a certain state of facts existed which might be found from the evidence the doctor stated that he would say the testator was competent to make a will.

On scanning carefully the hypothetical questions put to these two doctors and their answers to them it appears to us that they have no appreciable bearing on the point of the testator's competency at the time he made his will, nor do we perceive how they could have been considered as so bearing by a trial judge, especially one of the experience and well-known acumen of Judge SHERIDAN. And from the written decision of Judge SHERIDAN, occupying twelve pages of appellants' appendix, in which he stated at length the evidence that influenced his decision and in which he did not mention the expert testimony of these witnesses, we infer that he did not consider they had any bearing.

From the opinion of the trial judge, what moved him to decide the case as he did clearly appears. In it he states the evidentiary facts upon which he relied. The only one of these facts that made us pause is that the testator appeared in Judge HANSEN's branch of the trial court after his wife's death as witness in support of an application for a certificate of survivorship. This was six months after the will was executed. The testator's testimony on this occasion which was in evidence on the instant trial was such as to indicate to Judge SHERIDAN that the testator was incompetent when the will was made. We think, however, that it must yield to the undisputed evidence that the testator was at the time the will was drawn transacting the business connected with the operation of his saloon, buying his stock and paying for it weekly and waiting on customers and making change correctly, was keeping track of the doctor's visits to his wife, and paying for them in cash from the till of the saloon, and conducted the business with the undertaker in connection with the wife's burial in a competent and businesslike manner. The trial judge stated in his decision that the testator had no conception of the extent of his property. True the witness Williams, on whose testimony we have said the trial judge expressed reliance, testified that the testator did not know what the joint

property consisted of but he also testified that he never asked or heard the testator say anything about the property. The property consisted of five mortgages and three items of real estate, two rented, and the third occupied by the testator as a saloon and residence.

It further appears from the opinion that the judge was greatly influenced by the fact that after the wife's death the testator made conveyances and assignments without consideration, but the transfers were to the principal beneficiaries under the will and conformed to its provisions. An assignment of one mortgage was made by the executor Sowa under a power of attorney executed by the testator after the wife's death but the proceeds were accounted for as property of the estate. These transfers were considered by the court as a fraud on the testator, and this fraud was considered as evidence of undue influence by the principal beneficiaries in procuring the will. But the testator's possession of the property and his use of the income were not interfered with by the transferees and are explainable as intended to avoid the expense of probate of the will and perhaps evade payment of inheritance taxes, but this would not operate to defraud the testator. And the transfers though fraudulent could not be properly considered as relating back to show fraud in procuring execution of the will. Presumptions do not run backwards.

It having been stated on the hearing before us that the testator left no heirs, query was made by the court whether Mr. Meyer had any standing as guardian *ad litem* or otherwise to appear in this court or to file objections to the probate of the will in the court below. The objection had not been made by appellants and the point had not been raised in the court below. After some verbal wanderings by counsel and wonderings by the court the matter was left with the understanding that counsel would file supplemental briefs limited to the particular question. Such briefs have been filed.

We find nothing in these briefs directly to the question stated. The authorities cited all refer to situations in which there were in fact incompetent heirs living. It seems to us, *a priori,* that no one has any right to appear in court for unknown incompetent heirs unless there are living heirs whose names are unknown for him to appear for, or to file objections to granting relief asked for unless he is interested in the matter involved himself or is representing some living person who has an interest in it. It also appears to us that when it is represented to a county court by proponents of a will filing it for probate, or by a person filing a petition for administration, that the decedent has no heirs, the state under the escheat statutes is the only legal entity having any interest in the matter, except executor proponents and the beneficiaries of the will and the decedent's creditors. Proper notice having been given to them as was done here how may anyone else as matter of right appear in the proceedings or object to the granting of the relief granted?

But however this be, it is not necessary to determine that question now for the reasons which we will state, and we shall not assume to decide it.

The state appeared at the probate hearing by an assistant attorney general. It did not file formal objections to the probate of the will, but it in effect adopted the objections filed by Mr. Meyer, and availed itself of his efforts in the proceedings to defeat admission of the proposed will to probate. The trial court had before it the evidence presented at the hearing and it might properly consider the evidence received so far as competent by whomsoever it was presented. The state appeared in this court and filed a brief adopting and supplementing the brief of Mr. Meyer and it yielded to him the presentation of argument in support of the judgment below. We see no reason why we do not have jurisdiction on the appeal of the beneficiaries under the will to review the sufficiency of the

evidence to support probate, although there in fact are no incompetent heirs of the testator living.

*By the Court.*—The judgment of the county court is reversed, the judgment denying probate vacated, and the record remanded with directions to enter judgment declaring the will valid and admitting it to probate.